***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provision of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant on August 3, 2005.
3. Defendant-employer is self-insured with Key Risk Management Services, Inc. as the administrator.
4. Plaintiff sustained a compensable injury by accident to his back and neck on August 3, 2005.
5. The issues before the Commission are whether a head injury and cognitive problems are causally related to plaintiff's compensable injury by accident; what is plaintiff's correct average weekly wage; and whether plaintiff is capable of cooperating with vocational rehabilitation efforts.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the hearing before the Deputy Commissioner, plaintiff was 51 years old. He has a bachelor's degree and master's degree from the University of North Carolina at Asheville and has done post-graduate work at the University of Tennessee. *Page 3 
2. Plaintiff was employed with Western Carolina University beginning in 1997 as a contract part-time instructor of predominantly philosophy and religion. The amount of hours for each contract varied and each contract was for a set period of time.
3. On or about August 3, 2005, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. On that date, plaintiff slipped on a stairway and jerked his neck. Based upon the most reliable report of accident plaintiff subsequently made to his original treating physician, Dr. Craig Boatright, the Commission specifically finds that plaintiff did not fall down the staircase and did not strike his head.
4. Dr. Boatright, a board certified orthopedic specialist and spine surgeon, was the first medical provider to see plaintiff after plaintiff's slip on the stairs. Dr. Boatright examined plaintiff on August 8, 2005. At this visit, plaintiff was given a drawing with a figure outline and asked to draw in his face and, using the symbols given, mark the areas on his body where he felt the described sensations. Plaintiff drew in his face and it appears he drew hair on top of his head. He did not draw any pain symbols on the top of his head. On the same form, plaintiff rated his pain as the worst possible pain.
5. Plaintiff told Dr. Boatright that he slipped on the stairs and did not report a fall. Plaintiff did not report a direct blow to his head, but indicated that he really jerked his head and body around. Dr. Boatright specifically discussed how this accident happened with plaintiff and he made very detailed notes from that conversation. Understanding how the accident happened was key to Dr. Boatright so that he could assess how badly plaintiff may have been injured.
6. Dr. Boatright performed a physical exam of plaintiff on August 8, 2005. The physical exam revealed a supple neck without a lot of spasm. Plaintiff's skin was intact, with no signs of cuts or bruises. Plaintiff did not complain about and Dr. Boatright did not observe any *Page 4 
lumps on plaintiff's head. The physical exam showed no indications that plaintiff struck his head.
7. Dr. Boatright also found that plaintiff had a stable, non-tender range of motion without obvious deformity in the shoulders, elbows, wrists, hips, knees and ankles. Plaintiff's back had a fairly normal range of motion but the range-of-motion maneuvers caused an increase in his back pain complaints. Plaintiff was able to flex his neck two finger breadths about his chest and he had a fairly normal range of motion in his neck. Dr. Boatright also found plaintiff had some pain with palpation over the cervical and thoracic spine, more in the muscular than over the midline, and that his strength was good, and that his sensation, coordination and reflexes were normal.
8. A cervical spine series of x-rays was taken. These images showed three millimeters anterior listhesis of C7 on T1, a degenerative condition in which the C7 had slipped forward over the T1 vertebrae. Dr. Boatright also ordered a CT myelogram, fit plaintiff with a cervical collar, and took him out of work, pending those results. Based upon his review of the cervical spine x-rays and his examination of plaintiff at that time, which showed good range of motion of the neck, Dr. Boatright determined and the Commission finds that there was no new acute injury to the neck and the cervical listhesis was an old condition.
9. The CT of the cervical area was done on October 14, 2005. According to the report from the radiologist, the CT showed no fractures or bony abnormalities, with no evidence of acute traumatic injury. The CT did show the stable pre-existing degenerative 2-3 mm subluxation of C7 on T1. *Page 5 
10. Dr. Boatright referred plaintiff to see Dr. Laura Fleck at Spine Carolina for further testing due to an early demyelinating polyneuropathy which needed to be evaluated by a neurologist and was not the result of the on-the-job injury.
11. During Dr. Boatright's deposition, plaintiff's counsel indicated that he would be willing to stipulate to Dr. Hinnant's records. Plaintiff told Dr. Hinnant that he did not hit his head. In one of the records, Dr. Hinnant indicates that plaintiff is malingering, aggressive, seeking disability and desiring to close his workers' compensation case.
12. Plaintiff gave his various medical providers different accounts of his slip or fall, which were inconsistent with his first report to Dr. Boatright on August 8, 2005, of how the accident occurred. Plaintiff's later accounts were also inconsistent with the physical findings of Dr. Boatright at that first examination.
13. The only account of the accident which is consistent with the examination findings shortly after the accident, and which is therefore the most credible version of events, is the first report given to Dr. Boatright, and which is the basis for the Commission's findings of what happened when plaintiff slipped on the stairs but did not fall down the stairs or strike his head.
14. Dr. Richard Broadhurst is board certified in occupational and environmental medicine and treated plaintiff from February 15, 2006 through June 8, 2006. Plaintiff was initially brought into Dr. Broadhurst's practice at the Center for Occupational Rehabilitation (COR), for a functional restoration program which advanced to the work hardening program as plaintiff's function improved. These programs involved the care of a treatment team consisting of the physician, physical therapist Janet Greene, and psychologist Dr. Terence Fitzgerald. *Page 6 
15. Dr. Broadhurst has over eight years of experience dealing with patients with cognitive problems and impairments. On February 15, 2006, Dr. Broadhurst examined plaintiff. On physical exam, plaintiff had a full range of motion in his neck without tenderness or spasm, indicating that he had no pain in that area. Plaintiff's nerve functioning was normal. He had a normal affect or mood. There was no anxiety, and his memory and judgment were intact. Dr. Broadhurst did not detect any cognitive impairment.
16. As a result of his examination on February 15, 2006, Dr. Broadhurst assessed plaintiff with neck and low back strain, which had resolved as a result of the work injury that occurred on August 3, 2005. Dr. Broadhurst also determined and the Commission finds consistent with his opinion and the opinions expressed by Dr. Boatright and the radiologist, that plaintiff's cervical listhesis at C7 on T1 was not an acute finding, but pre-existed the work injury and is not related to plaintiff's work injury. The cervical degenerative joint disease and degenerative disc disease in the lumbar region were also pre-existing and not related to the work injury.
17. Dr. Broadhurst advised plaintiff to discontinue use of the cervical collar, as it was not necessary. Dr. Broadhurst attempted to wean plaintiff off his narcotic medications, as he did not find any significant injury which would cause pain sufficient to warrant long-term narcotic use.
18. Dr. Broadhurst also noted plaintiff made pain complaints in several regions which were inconsistent with the exam findings and suggestive of somatoform pain disorder. Other diagnoses unrelated to the work injury were chronic or recurring sinusitis, tobacco abuse, hypertension, history of alcohol abuse, sick sinus syndrome with a pacemaker in place, *Page 7 
dysplastic breast tissue, chronic left knee pain, and possible polyneuropathy in the lower extremities.
19. At plaintiff's visit with Dr. Broadhurst on March 20, 2006, plaintiff told the doctor that on the previous day he turned, lost his balance in his bedroom, and fell into his wife's vanity with his right hip, breaking the vanity. Plaintiff reported that he fell to the floor onto his right side and hit his head on the wall. Dr. Broadhurst suspected that plaintiff's leg did not really give way, but that plaintiff may have become dizzy or lightheaded and lost his balance.
20. Upon examination, Dr. Broadhurst found no signs of injury. Dr. Broadhurst did not see any contusion, bruising, swelling or redness, which would have confirmed that plaintiff struck anything with his body. Plaintiff's leg looked entirely normal, and plaintiff had no difficulty getting up on the exam table, lying down, or changing positions while he was lying on his back, which was atypical for someone who was suffering from a serious injury to the hip. Plaintiff's behaviors were inconsistent with his level of pain complaints. Plaintiff's neurological exam was normal.
21. Janet Greene is a licensed physical therapist who works with Dr. Fitzgerald and Dr. Broadhurst at COR. She started treating plaintiff on February 7, 2006. She testified that plaintiff started off doing relatively well in his therapy before the therapists noticed a big change in him around March 20, 2006. On that date, plaintiff called to cancel his therapy class because he said he fell at home and could not come. The next day during therapy class, he told Ms. Greene that on March 20, 2006, he had gone over to a friend's house to play with a cobra snake. Ms. Greene stated that plaintiff fell asleep while using the bike during therapy and that he told Ms. Greene that he had stayed up to 3:00 a.m. using the Internet. *Page 8 
22. Ms. Greene further noted that during the first few visits plaintiff was goal oriented and he was making progress. Plaintiff then went into a phase where he either did not attend or attended and closed his eyes during therapy, changed the activities, would leave the gym and not do the activities, was falling asleep because he was staying up too late at night and not attending to his therapy during the day. Plaintiff missed about 50% of his physical therapy appointments with Spine Carolina and he missed approximately the same number of appointments with COR.
23. On April 10, 2006, plaintiff claimed he fell on a treadmill during his functional capacity evaluation (FCE). Ms. Greene, who was conducting the FCE, observed plaintiff throughout the FCE and was emphatic that plaintiff did not fall. Two other staff members also observed him on the treadmill and noted that plaintiff did not fall. Dr. Broadhurst was satisfied that plaintiff did not fall during the FCE. The Commission accepts as credible Ms. Greene's testimony and rejects as not credible plaintiff's claim that he fell on this occasion.
24. Because plaintiff had complained previously of falling, he was watched closely in the gym. The treatment team had some concerns at times that plaintiff was under the influence of some substance, and plaintiff was tested for drugs. On March 31, 2006, plaintiff tested positive for THC, an active metabolite in marijuana, and positive for Oxycodone, which had not been prescribed. Another drug test performed on plaintiff on April 12, 2006, revealed the presence of benzodiazepines, acetaminophen or Tylenol, nicotine, methadone, meprobamate and Carisoprodol.
25. On some days, plaintiff appeared to be acting in an unusual fashion when he showed up for physical therapy. Dr. Broadhurst noted that there were a couple of times when plaintiff appeared unsteady in the gym and he recalled that those were the days when the therapists smelled alcohol and observed plaintiff's dishelved appearance. *Page 9 
26. At his exam with Dr. Broadhurst on June 8, 2006, plaintiff had slurred speech and sat primarily with his head down, staring at the ground. Dr. Broadhurst noted plaintiff appeared to be inebriated or in an altered state, and that plaintiff's behavior was suggestive of drug use. He appeared to be forcing himself to walk in an unusual pattern and was using a cane. Dr. Broadhurst found no evidence or behavior to suggest pain commiserate with his level of pain, which plaintiff stated was nine out of ten.
27. Dr. Broadhurst indicated that both plaintiff's Ransford Pain diagram and the Waddell's testing indicated that plaintiff was exaggerating his symptoms, which was consistent with plaintiff's behavior during his treatment. Although Dr. Broadhurst had told plaintiff that the cervical collar was not necessary, plaintiff at the beginning of physical therapy treatment told Ms. Greene that he had to wear his hard neck collar and that he was afraid he was going to be a quadriplegic because he broke his neck. Dr. Broadhurst believed that plaintiff was a hypochondriac and was overly worried about and exaggerated his symptoms.
28. During treatment team meetings, plaintiff stated that he had more education than anyone in the room and that his previous medical records were wrong. He also requested specific tests based on his research on the Internet.
29. Dr. Broadhurst refused as unnecessary plaintiff's request for a referral to Dr. Duncan Scott, an interventional pain specialist. Dr. Broadhurst did not believe that plaintiff had any significant pain disorder which warranted that type of treatment. Nor did Dr. Broadhurst refer plaintiff to neurologist Dr. Robert Armstrong, because Dr. Broadhurst did not attribute any of plaintiff's complaints to the workers' compensation injury.
30. Dr. Broadhurst gave plaintiff permanent restrictions of light or sedentary work. On March 5, 2007, Barbara Pollock, plaintiff's vocational rehabilitative counselor, provided Dr. *Page 10 
Broadhurst with a job description for a teaching/instructor position at defendant-employer. Dr. Broadhurst approved the position as written for plaintiff.
31. As of April 24, 2006, Dr. Broadhurst determined that plaintiff was at maximum medical improvement. Since the cervical and lumbar strains were resolved without any residual limitation, Dr. Broadhurst assessed no impairment ratings for those areas. The somatoform pain disorder did not warrant an impairment rating. Plaintiff's deconditioning had improved markedly with physical therapy, and plaintiff was responsible for keeping up with his home exercise program.
32. Dr. Broadhurst testified and the Full Commission finds that there was no causal connection between plaintiff's alleged cognitive problems and his work injury. The treatment team never found any significant neurological findings which were consistent with a reported head injury and cognitive impairments.
33. Dr. Broadhurst also stated that in his expert opinion, based on his review of plaintiff's medical records and his examination and treatment of plaintiff, there is nothing related to his accident that would limit plaintiff from continuing in vocational rehabilitation. Any aggravation of plaintiff's degenerative joint disease due to plaintiff's August 3, 2005 injury has returned to baseline.
34. Plaintiff chose to see Dr. Robert Armstrong for the first time on August 8, 2006. Plaintiff told Dr. Armstrong that he had cognitive problems and decreased memory, which plaintiff said had been occurring since he "fell down a flight of steps at work." Plaintiff told Dr. Armstrong that he was having a lot of problems remembering people's names and faces, having trouble making appointments, managing his finances, driving because he could not remember *Page 11 
how to get to places he had been before, and misplacing objects, and indicated that these problems began instantaneously, immediately after the work injury.
35. Dr. Armstrong had no factual information with which to form any opinions regarding the actual injury except what plaintiff told him. All of Dr. Armstrong's treatment and opinions are based on what plaintiff told him. Dr. Armstrong acknowledged that his records, which state "the symptoms have been associated with depression, intellectual deterioration and trauma," are based upon information he received from plaintiff and not upon Dr. Armstrong's observations or objective testing. Although plaintiff complained to Dr. Armstrong of slowed speech, Dr. Armstrong did not notice any speech problems.
36. Dr. Armstrong's physical exam of plaintiff during his August 8, 2006 examination revealed fairly good range of motion with no significant limitations. Plaintiff's general mental exam revealed plaintiff was alert, awake, and seemed to be in reasonably good health. Plaintiff was well groomed and had normal posture with full range of motion in his neck. Under the neurological exam, Dr. Armstrong found plaintiff's affect to be appropriate, his speech was clear, he was not having problems naming things or with word substitutions, was having no problem with thought content and he scored a 27 out of 30 on his cognitive function test. Plaintiff did not seem to have any problems filling out the intake sheet at Dr. Armstrong's office. Except for some changes in the sensory exam, which was subjective and based solely on plaintiff's report, plaintiff's examination was fairly normal.
37. Dr. Armstrong saw plaintiff again on November 1, 2006. Plaintiff's affect and speech were appropriate and he scored four out of four on his cognitive function test. He was well groomed and no problems were noted on his mental status exam. The remainder of the test was normal except for the walking which was noted in the initial visit. *Page 12 
38. Plaintiff's next visit with Dr. Armstrong was on March 8, 2007. Again, his mental status was still consistent. He was well groomed, normal posture was noted on the exam and he appeared alert, his speech was clear and appropriate. Thought content and perception was normal. Dr. Armstrong did not notice any cognitive problems while he was speaking to him. Dr. Armstrong testified that his concerns about a seizure came from a note written by plaintiff's wife; however, Dr. Armstrong did not note any concerns himself during that visit.
39. Dr. Armstrong saw plaintiff again on June 5, 2007, at which time plaintiff was alert, well-groomed, with normal posture, affect was appropriate, speech was clear and appropriate, thought content and perception was normal. The visits and exams appear consistent throughout.
40. Dr. Armstrong testified that in a typical case dealing with memory loss, stabilization appears three months after the patients are put on Aricept. Plaintiff was placed on Aricept at his first visit on August 8, 2006. However, from Dr. Armstrong's assessments, plaintiff stayed basically the same during his treatment.
41. Dr. Armstrong's opinions regarding plaintiff's ability to work at defendant-employer were based on what plaintiff told him he could and could not do. Dr. Armstrong was not provided a job description nor was he aware of what plaintiff actually did at his job.
42. Dr. Armstrong testified that no additional neuro-diagnostic workup was needed for plaintiff. Dr. Armstrong's assessments of plaintiff's need for assistance in his daily living or his ongoing cognitive problems are all based upon plaintiff's subjective reports, rather than objective findings. His assessments are also based upon plaintiff's report that he actually hit his head when he fell down the stairs, which the Full Commission rejects as not credible. Therefore, *Page 13 
to the extent that Dr. Armstrong's assessments are based solely on plaintiff's subjective reports, his opinions are given little weight.
43. The Aricept prescribed by Dr. Armstrong is not related to plaintiff's work injury. Plaintiff had insomnia problems prior to the work injury for which he took Ambien CR, so that prescription drug is not related to the work injury. The Hydrocodone, Percocet and Methadone, narcotic pain medications that plaintiff is currently using, are unrelated to the compensable work injury. The only prescription related to the work injury is Baclofen, which is used for intermittent spasms.
44. In his deposition Dr. Broadhurst explained that the August 11, 2006 CT scan of plaintiff's head, which was ordered by Dr. Armstrong, indicates involutional changes, which in laymen's terms means a degeneration of sorts, associated with aging. In plaintiff's case, the degeneration may be due to his chronic use of marijuana. Plaintiff admitted to Dr. Broadhurst that he smoked marijuana, both before and during treatment, which was also confirmed by the drug test results that were positive for THC.
45. As part of his treatment at the COR, plaintiff was evaluated by psychologist Terence Fitzgerald, Ph.D., who was part of the treatment team. Throughout his treatment, plaintiff's presentation to Dr. Fitzgerald was consistent. Plaintiff was casually dressed, marginally well groomed, superficially cooperative, but guarded. He was alert, with normal speech, and seemed to be of normal or slightly higher intelligence.
46. On testing plaintiff's memory, Dr. Fitzgerald found no deficits and no problems with short term memory encoding. Plaintiff had no difficulty following Dr. Fitzgerald's examination questions and no problems answering questions in a timely manner. There was no confusion. In terms of long-term memory, plaintiff was particularly detailed in his *Page 14 
autobiographical history of his previous jobs. Dr. Fitzgerald did not observe any decreased memory with plaintiff. Dr. Fitzgerald found plaintiff's primary concern was that he was going to die prematurely from cancer or heart disease or both. Plaintiff told Dr. Fitzgerald that he was going through the Kubler-Ross stages of death and expressed a fear of breaking his neck.
47. Plaintiff filled out pain drawings, beginning on February 1, 2006, in which he indicated past migraines before the injury and no head pain. There is no indication of head pain in the anterior or posterior areas in any of the pain drawings of February 7, 2006, April 4, 2006 or March 20, 2006. Plaintiff's pain diagram indicates almost a full body pain. In Dr. Fitzgerald's opinion, plaintiff's pain complaints appear to be for financial gain, associated with unnecessary prolongation of work disability. Plaintiff told Dr. Fitzgerald that it was his preference not to return to work and that he had made a decision to retire on disability.
48. Dr. Fitzgerald stated that plaintiff has a tendency to describe a lot of unusual somatic complaints across different organ systems. He chronically converts stress into physical complaints. Based on Dr. Fitzgerald's testing, plaintiff classifies himself in the range of "crippled." Plaintiff states his pain was a 9.9 or 10 and at a minimum was an 8.5 out of 10. Dr. Fitzgerald assessed plaintiff with functional somatic syndrome, also known as somatoform pain disorder. This pain disorder is maintained by psychological factors, as noted in plaintiff's case, for financial gain.
49. Plaintiff admitted his chronic use of marijuana to Dr. Fitzgerald. Plaintiff also told Dr. Fitzgerald that he felt like he was "caught between a rock and a hard place" in that he felt his wife needed 24-hour constant medical surveillance due to her severely degenerative multiple sclerosis and her short life expectancy. His wife's condition was just one incentive for *Page 15 
him not to return to work. He was also having problems with his stepson to the point plaintiff had to recommend taking out a restraining order on him.
50. Dr. Duncan Scott did not recall the first time he saw plaintiff as a patient; however, he did indicate that he treated plaintiff's wife. His interaction with plaintiff prior to treating plaintiff was limited to a few minutes when plaintiff accompanied his wife to Dr. Scott's office. Dr. Scott did not notice a change in plaintiff until August 4, 2006, when he very briefly saw plaintiff in Dr. Scott's office. Dr. Scott did not recall a cognitive impairment, just a dramatic change in plaintiff's appearance.
51. Dr. Scott testified that plaintiff tested positive for barbiturates, benzodiazepines, marijuana and opioids, which is noted in a discharge summary from Mission Hospital dated August 4, 2003. Plaintiff told Dr. Scott that his wife was selling her prescription pain medications on the street. Dr. Scott testified that plaintiff later indicated that he and his wife were having marital issues and that he made the comment to Dr. Scott in a vindictive and deceitful act towards his wife. On one of Dr. Scott's records, plaintiff marked that he "quit this year" next to marijuana in the substance abuse portion of the questionnaire. Dr. Scott discussed the use of opioids with plaintiff and did not discuss the marijuana use in much detail.
52. Plaintiff told Dr. Scott that he had a "big lump" on the top of his head after the fall and that he had a second lump on the left side of his head in the temporal region, neither of which is supported by plaintiff's prior medical records. Although Dr. Scott testified that he saw a "dramatic" change in plaintiff, he cannot say for sure what caused any of the changes he observed in plaintiff.
53. Dr. Scott's opinions regarding plaintiff's ability to work are based not on the FCE, but on Dr. Armstrong's notes indicating plaintiff had a closed head injury. Dr. Scott *Page 16 
testified that he observed plaintiff getting better after he saw Dr. Armstrong and started taking the Aricept. Plaintiff told Dr. Scott on September 11, 2006 that his cognitive function was much improved.
54. Dr. Scott testified that plaintiff had problems with insomnia in 2003 based on the discharge summary at Mission Hospital dated August 4, 2003 where it states "He admitted overusing these medications due to insomnia."
55. Dr. James McLaughlin was head of the Department of Philosophy and Religion at Western Carolina University, defendant-employer, from 1996 to 2000 and from 2003 to the date of the Deputy Commissioner's hearing. Dr. McLaughlin had known plaintiff since 1998 when he hired plaintiff to teach at the university. While he was a department head, Dr. McLaughlin also supervised plaintiff. Dr. McLaughlin considered himself to be plaintiff's friend.
56. Prior to plaintiff's work accident, Dr. McLaughlin had problems with plaintiff's performance while plaintiff was teaching at the university. For example, by mid-semester, one class still did not have the required syllabus and plaintiff had given the students only one assignment. Four days before the course ended, the students still had not received a syllabus. In the summer of 2003, plaintiff missed about a third of the classes when he simply called and said that he was not coming in. As a result, plaintiff was not hired the second term of the summer that year.
57. Dr. McLaughlin wrote an agreement for plaintiff to sign, stating the things that plaintiff had to do to continue teaching. Plaintiff was repeatedly late to his day classes in the spring of 2005, and also often missed the night classes he taught. Plaintiff often called only a couple of hours prior to the class start to give notice he was not showing up. Dr. McLaughlin talked to plaintiff on several occasions about his being late for class or not showing up at all. He *Page 17 
also had to talk to plaintiff about letting out the night classes an hour or two early because they only met for a total of three hours and ending the class early was inappropriate.
58. In the fall of 2004, plaintiff was supposed to give a department colloquy on quantum physics, but a few days before he was scheduled to speak, plaintiff said he could not do it and was going to talk instead about the German philosopher Leibniz. Plaintiff `s presentation was on an elementary level. Dr. McLaughlin also observed plaintiff's health decline over the years that he knew him. As a consequence of plaintiff's behavior, Dr. McLaughlin told plaintiff that the university would not employ him beyond the summer of 2005. Plaintiff responded that he had "won the lottery" and Dr. McLaughlin should not worry about it and that he had scored incredibly high on the NC TEACH exam.
59. One of the professors at the university accepted another position at the University of Montana and was scheduled to teach there in the fall of 2005. It was in the middle of the summer and Dr. McLaughlin had to find someone to teach a philosophy class. Dr. McLaughlin attempted to cancel the class, but it already had too many students enrolled, and, as a last resort, he asked plaintiff to teach the class. Less than one hour before that class was to start, plaintiff called Dr. McLaughlin to let him know that he had an accident and would not be able to teach that week. Dr. McLaughlin asked plaintiff to give him as much notice as possible if he was not be able to teach the class in the future. Less than one hour before class was to start the second week, plaintiff indicated he could not teach the class. Dr. McLaughlin ended up teaching the class the entire semester.
60. Dr. McLaughlin did write a letter of recommendation for plaintiff, which he tried to make positive. However, in the letter he qualified his remarks by saying things such as "for the most part" or he described plaintiff's enthusiasm, not his delivery. *Page 18 
61. After reviewing all the testimony presented, the Commission finds plaintiff's testimony to be not credible. None of the objective medical evidence supports a finding that plaintiff has any cognitive impairment or needs any attendant care. Medical testimony to the contrary, based upon plaintiff's subjective and not credible complaints, is not given any weight.
62. In weighing the medical evidence, the Full Commission gives greater weight to the opinions expressed by the initial treating physician, Dr. Boatright, and the staff of the treatment team at COR, Dr. Broadhurst, Dr. Fitzgerald, and Ms. Greene, than to the testimony of Dr. Scott and Dr. Armstrong. Plaintiff does not have ongoing chronic pain or cognitive deficits related to his accident of August 3, 2005. Plaintiff has a somatoform pain disorder, which was not caused by the accident at work.
63. Plaintiff has produced no credible evidence that he cannot continue in vocational rehabilitation. The evidence produced indicates that plaintiff is able to cooperate fully with vocational rehabilitation.
64. With regard to plaintiff's average weekly wage, the Form 22 was improperly calculated. The Form 22, along with the contracts under which plaintiff was hired, show that for the approximate 52 weeks prior to his injury by accident of August 3, 2005, plaintiff had four contractual payments which totaled $19,800. These payments were made as follows: for the period of August 15, 2004 to December 15, 2004, a contractual payment of $6,300 and another amount of $3,000; for the period of January 10, 2005 to May 6, 2005, payment of $6,300; for July 2005 payment of $2,100; and for August 2005 payment of $2,100. Plaintiff worked a total of 289 days during this time, which calculates to an average weekly wage of $479.58 and a compensation rate of $319.73.
 *********** *Page 19 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 3, 2005, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). Defendant has been paying and continues to pay plaintiff total disability compensation for his disability resulting from the compensable injury by accident. N.C. Gen. Stat. § 97-29.
2. As the result of the injury by accident on August 3, 2005, plaintiff sustained an injury to his back and neck for which he is entitled to have defendant provide medical treatment. Plaintiff `s alleged head injury, any cognitive deficits or impairment, or any need for attendant care are not due to his admittedly compensable injury by accident of August 3, 2005. Holley v. ACTS, Inc., 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003).
3. Based upon review of the Form 22, plaintiff's average weekly wage was not properly calculated under N.C. Gen. Stat. § 97-2(5), which provides, in pertinent part:
 Average weekly wages" shall mean the earnings of the injured employee in the employment in which he was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury . . . but if the injured employee lost more than seven consecutive calendar days at one or more times during such period, although not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks remaining after the time so lost has been deducted.
In calculating plaintiff's wages for the 52 weeks prior to his injury by accident, where plaintiff worked a total of 289 days and earned $19,800, his average weekly wage was $479.58, yielding a compensation rate of $319.73. *Page 20 
4. Plaintiff has produced no credible evidence that he cannot participate in vocational rehabilitation. Plaintiff is able to cooperate fully with vocational rehabilitation and should be ordered to comply with any reasonable vocational rehabilitation provided by defendant. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for workers' compensation benefits regarding his head injury and cognitive complaints and his request for attendant care must be, and is hereby DENIED.
2. Plaintiff's average weekly wage is $479.58, yielding a compensation rate of $319.73. Defendant shall pay plaintiff all past due benefits at this rate, in a lump sum, subject to the attorney's fee.
3. An attorney's fee of 25% of the lump sum due plaintiff shall be paid to his attorney. Thereafter, plaintiff's counsel shall receive every fourth check of the total disability compensation defendant is currently paying plaintiff.
4. Plaintiff is ORDERED to cooperate with reasonable vocational rehabilitation provided by defendant.
5. Defendant shall pay the cost, including all expert witness fees previously approved.
This 12th day of January, 2009.
S/__________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/__________________ DANNY LEE McDONALD COMMISSIONER
 S/__________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1